**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2646
_____

SHERI MINARSKY
                Appellant

v.

SUSQUEHANNA COUNTY;
THOMAS YADLOSKY, JR.

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(District Court No.: 3-14-cv-02021)
District Judge: Honorable Robert D. Mariani
_____

Argued April 18, 2018
_____

Before: GREENAWAY, JR., RENDELL, and FUENTES,
*Circuit Judges*

(Opinion Filed: July 3, 2081)

David M. Koller, Esq.                    [ARGUED]
Erin Grewe, Esq.
Koller Law
2043 Locust Street
Suite 1B
Philadelphia, PA 19103
        *Counsel for Appellant Sheri Minarsky*


Dana M. Zlotucha, Esq.                   [ARGUED]
Michael J. Donohue, Esq.
Kreder Brooks Hailstone
220 Penn Avenue
Suite 200
Scranton, PA 18503
        *Counsel for Appellee Susquehanna County*


Gerald J. Hanchulak, Esq.                [ARGUED]
The Hanchulak Law Offices
604 South State Street
Clarks Summit, PA 18411
        *Counsel for Appellee Thomas Yadlosky, Jr.*

---

## O P I N I O N

---

**RENDELL**, *Circuit Judge*:

Thomas Yadlosky, the former Director of Susquehanna County's Department of Veterans Affairs, made unwanted sexual advances toward his part-time secretary, Sheri Minarsky, for years. She never reported this conduct and explained in her deposition the reasons she did not do so. Although Yadlosky was warned twice to stop his inappropriate behavior, it was to no avail. The County ultimately terminated Yadlosky when the persistent nature of his behavior toward Minarsky came to light.

Minarsky seeks to hold Yadlosky, her supervisor, liable for sexual harassment, and her former employer, Susquehanna County, vicariously liable for said harassment. At issue in this case are the two elements of the *Faragher-Ellerth* affirmative defense that Susquehanna County has raised.[1] In granting summary judgment in favor of the

---

[1] To successfully invoke the *Faragher-Ellerth* affirmative defense, an employer must show that (i) it "exercised reasonable care to avoid harassment and to eliminate it when it might occur," and that (ii) the plaintiff "failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise prevent harm that could have been avoided." *Faragher v. City of Boca Raton*, 524 U.S. 775, 805 (1998).

County, the District Court held that the elements of this defense had been proven as a matter of law. We conclude that given the facts of this case, the availability of the defense regarding both the first element, whether the County took reasonable care to detect and eliminate the harassment, as well as the second element, whether Minarsky acted reasonably in not availing herself of the County's anti-harassment safeguards, should be decided by a jury. Accordingly, we will vacate the judgment of the District Court and remand for further proceedings.[2]

## I.     Factual Background

On appeal from the grant of summary judgment in favor of Defendant Susquehanna County, we view the facts in the light most favorable to Plaintiff Minarsky. Nevertheless, the facts are largely undisputed.

## A.  Yadlosky's Alleged Harassment

Minarsky served as a part-time secretary at the Susquehanna County Department of Veterans Affairs, working Mondays, Wednesdays, and Fridays. On Fridays, Minarsky worked for Defendant Yadlosky. They worked together in an area separate from other County employees.[3]

---

[2] Minarsky also challenges the District Court's dismissal of her remaining state law claim of assault against Yadlosky for lack of supplemental jurisdiction, but that issue is moot in light of our decision.

[3] Yadlosky was a full-time employee, but worked out of different offices on the other days.

Minarsky alleges that soon after she started working at the Department in September of 2009, Yadlosky began to sexually harass her. Yadlosky would attempt to kiss her on the lips before he left each Friday, and would approach her from behind and embrace her, "pull[ing] [her] against him." A. 98. When Minarsky was at her computer or the printer, Yadlosky would purportedly massage her shoulders or touch her face. She testified that these advances were unwanted, and happened frequently—nearly every week. As they worked together, alone, others were seldom present to observe Yadlosky's conduct, other than during the holiday season each year, when Yadlosky asked Minarsky and other female employees to kiss him under mistletoe.[4]

Yadlosky engaged in other non-physical conduct that Minarsky found disturbing. For example, he often questioned Minarsky about her whereabouts during her lunch hour and with whom she was eating. He called her at home on her days off under the pretense of a work-related query but proceeded to ask personal questions. Yadlosky allegedly became hostile if she avoided answering these calls. He sent sexually explicit messages from his work email to Minarsky's work email, to which Minarsky did not respond. He also behaved unpredictably, as on one occasion when he insisted that Minarsky take two full days off, unpaid, to drive her daughter to her cancer treatment, but soon after, he chastised her for seeking time off—even though it fell on days they did not work together.

---

[4] Another instance noted in the record of an employee observing Yadlosky's behavior toward Minarsky is the incident involving Connie Orangasick. *See infra* pp. 6–7.

Minarsky alleges that the harassment intensified as time passed. When the harassment first began, she mildly and jokingly told him to stop. He did not. She claims that Yadlosky knew that her young daughter was ill and thus knew Minarsky depended on her employment to pay medical bills. She states that she feared speaking up to him in any context, let alone to protest his harassment, because he would react and sometimes become "nasty." A. 142.

## B. Prior Reprimands

Yadlosky reported to Sylvia Beamer, the Chief County Clerk, who reported to the Susquehanna County Commissioners. On two separate occasions, Beamer became aware of Yadlosky's inappropriate behavior toward other women, and reprimanded him. County Commissioner Maryann Warren was aware of one of these incidents. First, in 2009, Beamer observed Yadlosky embrace a female employee. Beamer verbally admonished Yadlosky and told him that such behavior was inappropriate. Second, Commissioner Warren observed Yadlosky act inappropriately with the County's Director of Elections in late 2011 or early 2012. Warren notified Beamer that she saw Yadlosky hug the Director and kiss her on the cheek. Beamer verbally reprimanded Yadlosky once again and told him he could face termination if his inappropriate behavior continued. After both incidents, there was no further action or follow-up, nor was any notation or report placed in Yadlosky's personnel file.

Minarsky became aware of the first reprimand, but not the second. In Minarsky's deposition, she recounted a time when another employee, Connie Orangasick, saw Yadlosky

6

approaching Minarsky from behind and hugging her. Orangasick walked by, noticed the situation, and said to Yadlosky, "I thought you said yesterday you're not supposed to do that anymore." A. 99. A few minutes later, he responded that he could do whatever he wanted "[o]ver here," referring to the building where he and Minarsky were largely separated from other employees. A. 100. When Minarsky followed up with Orangasick, she learned that Beamer had warned Yadlosky about his inappropriate behavior. After being warned, he then allegedly came back to his office and joked about the incident to Orangasick.

Minarsky also learned that other women had similar encounters with Yadlosky. In addition to the mistletoe episodes, Minarsky spoke to another secretary, Rachel Carrico, who mentioned that she had problems with Yadlosky's hugging, as well. Also, once when Beamer was in the Veterans Affairs office, Minarsky observed Yadlosky as he was attempting to embrace Beamer, but she stopped him and said, "Get away from me." A. 111.

## C. The County's Anti-Harassment Policy

On her first day of work, Minarsky read and signed Susquehanna County's General Harassment Policy. It states that harassment based upon "sex, age, race, religion, national origin, ethnicity, disability, sexual preference and any other protected classification" is prohibited. A. 166; A. 205–06. According to the policy, an employee could report any harassment to their supervisor; if the supervisor is the source of the harassment, the employee could report this to the Chief County Clerk or a County Commissioner.

7

During the four years Minarsky avers that she was harassed by Yadlosky, she did not report this harassment to either Beamer, the Chief County Clerk, or any of the County Commissioners. Minarsky alleges that she feared elevating the claims to County administrators, because Yadlosky repeatedly warned her not to trust the County Commissioners or Beamer. She claims that he would often tell her to look busy or else they would terminate her position. These warnings, Minarsky contends, along with the fact that Yadlosky had been reprimanded unsuccessfully for his inappropriate advances toward others, prevented her from reporting Yadlosky.

## D. Yadlosky's Termination

In her deposition, Minarsky recounted that she finally revealed the harassment and its emotional toll on her health to her physician in April of 2013. The doctor discussed the situation with Minarsky and emphasized the need to bring an end to the conduct. She encouraged Minarsky to compose an email to Yadlosky, so she would have some documentation.

Minarsky testified that she agonized over this, but finally sent Yadlosky an email on July 10, 2013, prompted by the incident in which Yadlosky allegedly reacted negatively when Minarsky asked to take time off for her daughter's treatment. She wrote, "I want to just let you know how uncomfortable I am when you hug, touch and kiss me. I don't think this is appropriate at work, and would like you to stop doing it. I don't want to go to Sylvia [Beamer]. I would rather resolve this ourselves." A. 170. Yadlosky responded,

8

First and more importantly, I never meant to make you feel uncomfortable nor would I ever want to offend you in any way and I will STOP IMMEDIATELY. Secondly, almost from the first day you started (3 years and 9 months) I have been affectionate to you, among other people I was close to[] (only in a friendly manner, no other way intended), why have you never said anything to me before. Third, and to me most important, I thought we had a very good working relationship where we could approach one another on any matters. It disturbs me that you would put this out on an e-mail and not talk to me about this. Apparently I was wrong on thinking that. If you wanted to do this in writing, for proof, you could have typed this out and I would have signed it and you could have kept it.

A. 170. He confronted Minarsky about the email on July 12; she claims that he seemed mostly concerned that his reputation might be tarnished if someone else read her email.

Around the same time, Minarsky confided in her friend and co-worker, Rachel Carrico, about Yadlosky's harassment. When Carrico mentioned what was happening between Yadlosky and Minarsky to another employee, Carrico's supervisor overheard the conversation and reported Yadlosky's conduct to Beamer. At first, Minarsky objected, for fear of losing her job. But Beamer had already been notified, and she interviewed Minarsky about her allegations within a few days. Beamer informed the County Commissioners, who agreed that Yadlosky should be

9

terminated. The next day, Beamer interviewed Yadlosky. When he admitted to the allegations, Yadlosky was immediately placed on paid administrative leave, and then terminated. The County then hired a Human Resources Director to oversee personnel issues.

Minarsky quit several years later, and she alleges she was uncomfortable in her role after Yadlosky was fired, because her workload increased, and because of inquiries from her new supervisor asking about what had transpired with Yadlosky and who else she had caused to be fired.

## II. Procedural History

Plaintiff Minarsky filed a Complaint, Amended Complaint, and a Second Amended Complaint with five causes of action against Susquehanna County and two against Yadlosky. The counts against the County were: gender discrimination, sexual harassment through a hostile work environment, and quid pro quo sexual harassment, all under Title VII of the Civil Rights Act; gender discrimination under the Pennsylvania Human Relations Act (PHRA); and negligent hiring and retention under Pennsylvania state law. The counts against Yadlosky, all under state law, were: gender discrimination under the PHRA (later withdrawn), intentional infliction of emotion distress (IIED), and assault.

The District Court granted Yadlosky's Motion to Dismiss the IIED claim but denied the County's Motion for Judgment on the Pleadings. After discovery, the County moved for summary judgment. The District Court adopted the Magistrate Judge's Report and Recommendation and granted the County's Motion for Summary Judgment, while

dismissing the remaining count of assault against Yadlosky—the lone remaining state law claim—for lack of supplemental jurisdiction.

On appeal, Minarsky claims that the District Court erred in finding that the County had satisfied both elements of the *Faragher-Ellerth* affirmative defense as to the claim of sexual harassment through a hostile work environment and erred in dismissing the state law claim for lack of supplemental jurisdiction.

## III.    Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. This Court has jurisdiction over final orders of the District Court pursuant to 28 U.S.C. § 1291.

We exercise plenary review over the grant or denial of summary judgment and apply the same standard the district court should have applied. *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact," and thus the movant "is entitled to judgment as a matter of law." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). We deny summary judgment if there is enough evidence for a jury to reasonably find for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV.  Hostile Work Environment Claim

On appeal, Minarsky does not contest the District Court's grant of summary judgment on the claims for gender discrimination and quid pro quo sexual harassment in violation of Title VII and the PHRA. Thus, we focus our analysis on the claim of sexual harassment based on a hostile work environment. To establish a Title VII hostile work environment claim against one's employer, a plaintiff employee must prove:

> 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability.

*Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (internal citations omitted). Defendant Susquehanna County only contests the fifth prong, vicarious liability, which frames our analysis on appeal.

### A. The *Faragher-Ellerth* Affirmative Defense

In the companion cases of *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), the U.S. Supreme Court established standards for when an employee who was harassed in the workplace by a supervisor may impute liability to the employer. In doing so, the Court acknowledged

the sensitive nature of workplace harassment: "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Ellerth*, 524 U.S. at 763.

If the harassment resulted in a "tangible employment action" against the employee, then the employer is strictly liable. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 328 (3d Cir. 2015) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004)). The Supreme Court has described a tangible employment action as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761.[5]

However, if the harassed employee suffered no tangible employment action, as in the present scenario,[6] the employer can avoid liability by asserting the *Faragher-*

---

[5] To prove a claim for gender discrimination under Title VII or the PHRA and quid pro quo sexual harassment under Title VII, a plaintiff must show that she suffered an adverse employment action, or "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones*, 796 F.3d at 326 (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). "Regardless of whether [tangible employment action] means precisely the same thing as 'adverse employment action,' we think it clear that neither phrase applies" in this case. *Id.* at 328.

[6] Minarsky did not proffer evidence that she was reassigned, discharged, or demoted.

13

*Ellerth* affirmative defense. The employer must show "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765.

The cornerstone of this analysis is reasonableness: the reasonableness of the employer's preventative and corrective measures, and the reasonableness of the employee's efforts (or lack thereof) to report misconduct and avoid further harm. Thus, the existence of a functioning anti-harassment policy *could* prove the employer's exercise of reasonable care so as to satisfy the first element of the affirmative defense. *Faragher*, 524 U.S. at 807.

To prove the second element of the affirmative defense, that the plaintiff unreasonably failed to avail herself of the employer's "preventive or corrective opportunities," the Supreme Court has held that "proof that an employee failed to [exercise] reasonable care to avoid harm . . . will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* at 807–08; *Ellerth*, 524 U.S. at 765.

## B.  District Court Rulings

The Magistrate Judge recommended that the District Court grant summary judgment on all counts. He determined that the County acted reasonably: first, for maintaining an anti-harassment policy, with which Minarsky was familiar,

14

and second, for reprimanding Yadlosky for his inappropriate conduct two times in the past and for promptly terminating Yadlosky once his misconduct toward Minarsky came to light.

The Judge also found Minarsky's silence—her failure to report the harassment—unreasonable. "The County's reasonable policies and responses," the Magistrate Judge wrote, "are set in stark contrast to the plaintiff's refusal or unwillingness to avail herself of the County's anti-harassment policy to bring Yadlosky's conduct to the attention of County officials." *Minarsky v. Susquehanna Cty.*, 2017 WL 4475978, at \*6 (M.D. Pa. May 22, 2017). The Magistrate Judge dismissed Minarsky's alleged apprehension of the Chief Clerk and County Commissioners as unreasonable, because her mistrust of them came "from the very employee Minarsky claims was harassing her," and was not sufficient to excuse her failure to report. *Id.* He cited to caselaw for the principle that a prolonged failure to report misconduct, when a policy existed to report the conduct, is unreasonable as a matter of law, under the facts of those cases.[7]

The Magistrate Judge acknowledged that a failure to avail oneself of a sexual harassment policy, in fear of retaliation, may be reasonable when grounded in fact, which

---

[7] *E.g.*, *Newsome v. Admin. Office of the Courts of the State of N.J.*, 51 F. App'x 76, 80 (3d Cir. 2002) (non-precedential) (a two-year delay in reporting harassment was unreasonable); *Gawley v. Ind. Univ.*, 276 F.3d 301, 312 (7th Cir. 2001) (seven-month delay unreasonable); *Cacciola v. Work N Gear*, 23 F. Supp. 3d 518, 531–32 (E.D. Pa. 2014) (nine-month delay unreasonable).

he distinguished from what he found to be Minarsky's unfounded concerns. He contrasted Minarsky's situation with the plaintiff's in *Still v. Cummins Power System*, who observed fellow employees suffer retaliation for having followed the anti-harassment policy, and was thus justified in not reporting. 2009 WL 57021, at *13 (E.D. Pa. Jan. 8, 2009).

Minarsky lodged objections to the Magistrate Judge's Report and Recommendation, but the District Court rejected Minarsky's objections and adopted the Report and Recommendation in its entirety. The Court found that the County satisfied the *Faragher-Ellerth* defense: although the County was unaware of Yadlosky's misconduct toward Minarsky, it warned him after each prior incident and fired him as soon as Beamer and the Commissioners were made aware of the allegations, all while Minarsky did not avail herself of the County's sexual harassment policy because she feared the consequences of reporting. The District Court concluded, "no reasonable jury could find that Plaintiff acted reasonably in failing to avail herself of the protections of the sexual harassment policy." *Minarsky v. Susquehanna Cty.*, 2017 WL 4475981, at *1 (M.D. Pa. June 28, 2017).

## C. Analysis

### 1. Element One

The first element of the *Faragher-Ellerth* affirmative defense concerns whether the County "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at 765. We acknowledge that the County maintained a written anti-harassment policy, which Minarsky was asked to read

16

and sign on her first day. The policy prohibited harassment in the workplace, directed employees to report any harassment to a supervisor, and provided that an employee "may" report to the Chief Clerk or a County Commissioner if the supervisor was the source of harassment. A. 166–67.

The District Court determined that the County had reasonable policies and responses so as to satisfy the first prong of *Faragher-Ellerth* as a matter of law. We disagree. While Yadlosky was reprimanded twice and ultimately fired, we cannot agree that the County's responses were so clearly sufficient as to warrant the District Court's conclusion as a matter of law. Yadlosky's conduct toward Minarsky was not unique; Minarsky's deposition testimony revealed a pattern of unwanted advances toward multiple women other than herself. *See, e.g.*, A. 102–03.

In addition to the mistletoe incidents and his advances toward Rachel Carrico and Connie Orangasick, Yadlosky had also made inappropriate physical advances to two of the women in authority, Chief Clerk Beamer and Commissioner Warren. Minarsky testified that when she later attended the hearing to determine Yadlosky's eligibility for unemployment benefits, she was shocked to learn of the extent to which Beamer knew of Yadlosky's pattern of inappropriate physical contact: apart from the two times Beamer reprimanded Yadlosky for hugging other employees, Yadlosky tried to hug Beamer, too.[8]  In her deposition, Commissioner Warren also

---

[8] In her deposition, Beamer testified, "Once I believe he was going to [hug me]. It was in my office and he started to come around my desk and I just said don't go there. That was early on." A. 192:10–12.

testified that Yadlosky attempted to hug her, put his arm around her, or kiss her on the cheek approximately *ten times*.[9] Although as a Commissioner, Warren was in a position to discipline Yadlosky for his behavior, and although she raised his misconduct to County Commissioner Hall, neither Warren nor Hall reprimanded Yadlosky.[10] Thus, County officials were faced with indicators that Yadlosky's behavior formed a pattern of conduct, as opposed to mere stray incidents, yet they seemingly turned a blind eye toward Yadlosky's harassment.

Was the policy in place effective? Knowing of his behavior, and knowing that Minarsky worked alone with Yadlosky every Friday, should someone have ensured that she was not being victimized? Was his termination not so much a reflection of the policy's effectiveness, but rather, did it evidence the County's exasperation, much like the straw that broke the camel's back? We do not answer these questions, but conclude that there exists enough of a dispute of material fact, and thus a jury should judge all of the facts as to whether the County "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," *Faragher*, 524 U.S. at 807; *Ellerth*, 524 U.S. at

---

[9] Warren: "He would kind of giggle like a girl, come around the table and lean over and . . . hug me and tried to kiss me on the cheek. . . . I backed the chair up, told him to get away, [asked him what he was] doing and to stop being a jerk." A. 260:16–18, 21–22.

[10] In her deposition, Warren stated that she needed another Commissioner to sign off if she were to take any action against Yadlosky.

765, and thereby determine whether the County satisfied the first element of *Faragher-Ellerth*.

## 2. *Element Two*

The second element, regarding the reasonableness of Minarsky's failure to report Yadlosky's behavior, presents a similarly troubling set of facts. On the one hand, she remained silent and did nothing to avoid further harm. On the other hand, her silence might be viewed as objectively reasonable in light of the persuasive facts Minarsky has set forth.

We are sensitive to the Supreme Court's emphasis that the second *Faragher-Ellerth* element is tied to the objective of Title VII, to avoid harm, rather than provide redress. *Faragher*, 524 U.S. at 806–07 ("[N]o award against a liable employer should reward a plaintiff for what her own efforts could have avoided."). We also acknowledge that our case precedent has routinely found the passage of time coupled with the failure to take advantage of the employer's anti-harassment policy to be unreasonable, as did the District Court here. *E.g.*, *Jones*, 796 F.3d at 329.[11]

Nevertheless, we cannot ignore Minarsky's testimony as to why she did not report Yadlosky's conduct, and we

---

[11] In *Jones*, the plaintiff's ten-year delay in reporting her alleged harassment was just one factor we credited in concluding that the defendant satisfied *Faragher-Ellerth*.

19

believe that a jury could find that she did not act unreasonably under the circumstances.[12]

---

[12] This appeal comes to us in the midst of national news regarding a veritable firestorm of allegations of rampant sexual misconduct that has been closeted for years, not reported by the victims. It has come to light, years later, that people in positions of power and celebrity have exploited their authority to make unwanted sexual advances. In many such instances, the harasser wielded control over the harassed individual's employment or work environment. In nearly all of the instances, the victims asserted a plausible fear of serious adverse consequences had they spoken up at the time that the conduct occurred. While the policy underlying *Faragher-Ellerth* places the onus on the harassed employee to report her harasser, and would fault her for not calling out this conduct so as to prevent it, a jury could conclude that the employee's non-reporting was understandable, perhaps even reasonable. That is, there may be a certain fallacy that underlies the notion that reporting sexual misconduct will end it. Victims do not always view it in this way. Instead, they anticipate negative consequences or fear that the harassers will face no reprimand; thus, more often than not, victims choose not to report the harassment.

Recent news articles report that studies have shown that not only is sex-based harassment in the workplace pervasive, but also the failure to report is widespread. Nearly one-third of American women have experienced unwanted sexual advances from male coworkers, and nearly a quarter of American women have experienced such advances from men who had influence over the conditions of their employment, according to an ABC News/Washington Post poll from October of 2017. Most all of the women who experienced

Although we have often found that a plaintiff's outright failure to report persistent sexual harassment is unreasonable as a matter of law, particularly when the opportunity to make such complaints exists, we write to clarify that a mere failure to report one's harassment is not *per se* unreasonable. Moreover, the passage of time is just one factor in the analysis. Workplace sexual harassment is highly

harassment report that the male harassers faced no consequences. ABC News/Washington Post, *Unwanted Sexual Advances: Not Just a Hollywood Story* (Oct. 17, 2017), http://www.langerresearch.com/wp-content/uploads/1192a1SexualHarassment.pdf.

Additionally, three out of four women who have been harassed fail to report it. A 2016 Equal Employment Opportunity Commission (EEOC) Select Task Force study found that approximately 75 percent of those who experienced harassment *never* reported it or filed a complaint, but instead would "avoid the harasser, deny or downplay the gravity of the situation, or attempt to ignore, forget, or endure the behavior." EEOC Select Task Force, *Harassment in the Workplace*, at v (June 2016), https://www.eeoc.gov/eeoc/task_force/harassment/upload/report.pdf. Those employees who faced harassing behavior did not report this experience "because they fear[ed] disbelief of their claim, inaction on their claim, blame, or social or professional retaliation." *Id.*; *see also* Stefanie Johnson, et al., *Why We Fail to Report Sexual Harassment*, Harvard Business Review (Oct. 4, 2016), http://hbr.org/2016/10/why-we-fail-to-report-sexual-harassment (women do not report harassment because of retaliation fears, the bystander effect, and male-dominated work environments).

circumstance-specific, and thus the reasonableness of a plaintiff's actions is a paradigmatic question for the jury, in certain cases. If a plaintiff's genuinely held, subjective belief of potential retaliation from reporting her harassment appears to be well-founded, and a jury could find that this belief is objectively reasonable, the trial court should not find that the defendant has proven the second *Faragher-Ellerth* element as a matter of law. Instead, the court should leave the issue for the jury to determine at trial.

Here, Minarsky asserts several countervailing forces that prevented her from reporting Yadlosky's conduct to Beamer or a County Commissioner: her fear of Yadlosky's hostility on a day-to-day basis and retaliation by having her fired; her worry of being terminated by the Chief Clerk; and the futility of reporting, since others knew of his conduct, yet it continued. All of these factors were aggravated by the pressing financial situation she faced with her daughter's cancer treatment.

First, the particular nature of Minarsky's working relationship with Yadlosky complicated the situation. They worked alone one day each week, away from others, and on other days he continued to monitor her, ostensibly utilizing his control over her work environment to harass her. Appellees argue that the superior-subordinate dynamic is unremarkable, because all *Faragher-Ellerth* cases involve a power imbalance wherein the harasser controls the working conditions of the harassed. We disagree that this is irrelevant; the degree of control and specific power dynamic can offer context to the plaintiff's subjectively held fear of speaking up, for instance, if the supervisor "took advantage of the power vested in them . . . to facilitate their abuse" or harassment.

*Vance v. Ball State Univ.*, 570 U.S. 421, 458 (2013) (quoting *Faragher*, 524 U.S. at 801).

Second, when Minarsky attempted to assert herself in the workplace, she alleges that Yadlosky became "nasty," which deepened her fear of defending herself or disclosing Yadlosky's misconduct. For example, if she tried to request personal days off or ignored his phone calls on days she was not working, he became ill-tempered. She said,

> He was just unpredictable with his temperament. I had to watch what I said to him. I had to watch how I acted around him. It seemed if he didn't get what he wanted, I seemed to get treated more miserably. The day would be harder if I spoke up about anything he said or [did] in the office. I had to just watch what I did.

A. 153:15–20; *see also* A. 158:6 ("[H]e had a temper."). Moreover, when asked why she was unable to vocally protest Yadlosky's attempts to kiss her, Minarsky stated that she needed her job to pay her daughter's medical bills, and worried that she might lose her job or otherwise be retaliated against if she voiced her distress.[13] When Yadlosky would approach Minarsky because "he thought he should kiss [her] on the lips before he left" each Friday, A. 97:21–22, Minarsky stated in her deposition, "I did not know how to respond. It happened so quickly. I was under probation so I

---

[13] Minarsky did, however, refuse to walk into his office if there was mistletoe hanging, and admits that this was the only time she specifically voiced her discomfort.

was concerned that . . . if I did not, what was going to happen [to my job]."[14] A. 98:10–12. Although she avers that she meekly protested, she states, "I know I didn't dare speak up to him." A. 99:10–11.

We distinguish this situation from one in which the employee's fear of retaliation is generalized and unsupported by evidence. Several courts have held that a generalized fear of retaliation is insufficient to explain a long delay in reporting sexual harassment. *See, e.g.*, *Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1063 (10th Cir. 2009) (citing cases from the Fifth, Sixth, Eighth, and Eleventh Circuit Courts of Appeals where a generalized fear of retaliation did not excuse a two-to-four month delay in reporting harassment).[15] The First Circuit Court of Appeals has held that a fear of retaliation that is substantiated by evidence in the record may excuse a failure to report, and the jury should decide the credibility of the witness expressing this fear. *See Burns v. Johnson*, 829 F.3d 1, 19 (1st Cir. 2016) (finding "evidence in the record that Burns feared retaliation, which is bolstered by the fact that others expressed fear of

---

[14] When Minarsky first began working at the County, her employment was probationary for the first six months.

[15] *See Casiano v. AT&T Corp.*, 213 F.3d 278, 280–81, 287 (5th Cir. 2000) (a four-month delay was unreasonable); *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 457 (6th Cir. 2008) (two-month delay); *Williams v. Missouri Dep't of Mental Health*, 407 F.3d 972, 976 (8th Cir. 2005) (four-month delay); *Walton v. Johnson & Johnson Svcs., Inc.*, 347 F.3d 1272, 1277, 1290–91 (11th Cir. 2003) (two-and-a-half-month delay).

retaliation for mere participation in the . . . investigation into [the harassment, along with] evidence that Burns had earlier reported her concerns, including to her direct supervisor").

Here, Minarsky identifies instances where asserting herself rendered her working conditions even more hostile, and she was led to believe that she should not protest her supervisor's conduct. Presented with these facts, a reasonable jury could find that Minarsky's fear of aggravating her work environment was sufficiently specific, rather than simply a generalized, unsubstantiated fear.[16]

Third, although Minarsky's fear of retaliation was subjective, we disagree with the District Court's view that it was clearly unfounded. Yadlosky discouraged her from using the anti-harassment policy by underscoring that she could not trust the Commissioners or the Chief Clerk—those to whom she would report the harassment. He warned her that they might "get rid" of Minarsky and her job, which she alleged "made it very hard for [her] to think of going to them." A. 101:20–21, 24–25. The District Court discounted this because it was Yadlosky himself who made these comments. But the fact that he was the harasser does not mean that Minarsky should have disbelieved his comments about people in authority whom he knew better than she did, and does not render her fear unfounded. Minarsky was merely a part-time employee. Yadlosky was the Director of Veterans Affairs for the County. We do not think that her failure to avail herself of

---

[16] The trial judge can instruct the jury that a plaintiff's fears must be specific, not generalized, in order to defeat the *Faragher-Ellerth* defense.

this avenue was necessarily unreasonable, and a jury could find the same.

Fourth, Minarsky discovered that the County had known of Yadlosky's behavior and merely slapped him on the wrist, without more—bolstering Minarsky's claim that she feared the County would ignore any report she made. "[H]e had been warned and it went nowhere," she observed. A. 142:21. She proffered evidence that Yadlosky openly disregarded his behavioral warnings in front of Minarsky and continued to emphasize distrust with the County officials. She said,

> [The warning] didn't phase him at all and he's telling me not to trust the Chief Clerk, the Commissioners; they would get rid of me; they would get rid of my job. I didn't know how to perceive that. Was this going to mean my job if I speak up? *It didn't help the first time with the first person speaking up.*

A. 142:22–143:1 (emphasis added). A jury could find that Minarsky reasonably believed that availing herself of the anti-harassment policy would be futile, if not detrimental. *See, e.g.*, *Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 437 (5th Cir. 2005) (a harassed employee "is not obligated to go through the wasted motion of reporting the harassment" if the employee reasonably believes that subsequent complaints would be futile).

Fifth, a reasonable jury could consider the pernicious nature of the harassment compounded with its frequency and duration to contextualize Minarsky's actions. Minarsky

26

endured over three-and-a-half years of being kissed on the lips, touched, and embraced by her boss, without her consent, all while he sent her explicit emails and monitored her whereabouts. She witnessed him hugging others and asking female employees to kiss him under mistletoe. Minarsky seemingly agonized over her situation. She only revealed her harassment to her husband years later, because she knew he would have urged her to quit even though her family desperately needed the money. When Minarsky eventually did share her situation with her husband, she expressed that if she quit, she then feared Yadlosky would harass her replacement.[17] Even then, it was only after Minarsky's medical doctor emphasized that Minarsky was being treated inappropriately, and encouraged her to confront Yadlosky to hopefully bring an end to the harassment and its physical and emotional toll, did Minarsky finally do so.

Rather than view this merely as Minarsky's idle delay in reporting, a jury could consider the aggravating effect of prolonged, agonizing harassment as a way to credit Minarsky's fear of worsening her situation.

Appellees argue that Minarsky's behavior was unreasonable, given her knowledge of the County's anti-harassment policy and her failure to use the policy, by pointing to the line in Minarsky's email to Yadlosky, "I don't want to go to Sylvia. I would rather resolve this ourselves." A. 170. While Appellees characterize this as evidence

---

[17] Minarsky: "I relayed to him that I was concerned about, if I quit, Tom [will do] this to the next person. . . . How do I quit, knowing that [Yadlosky is] going to continue this? How do I get him to understand that it's wrong?" A. 157:20–21, 22–24.

27

Minarsky deliberately refrained from using the policy's protections, Minarsky averred in her deposition that it was her way of informing Yadlosky that she *would* resort to the harassment policy if his conduct did not change.[18] Whether this evidence negates the reasonableness of Minarsky's non-reporting is for the jury, not us, to decide.

In sum, Minarsky has produced several pieces of evidence of her fear that sounding the alarm on her harasser would aggravate her work environment or result in her termination. A jury could consider this evidence and find her reaction to be objectively reasonable. We therefore cannot uphold the District Court's conclusion that Minarsky's behavior was unreasonable as a matter of law.

Thus, we will vacate the District Court's Order granting summary judgment in favor of the County and remand for further proceedings consistent with this opinion.

## V. Supplemental Jurisdiction

Minarsky appeals the District Court's ruling not to exercise supplemental jurisdiction over her sole state-law claim of assault against Yadlosky. Because we vacate the dismissal of the hostile work environment claim under Title VII of the Civil Rights Act, on remand, the District Court will have a federal claim once again. The Court can therefore choose to exercise supplemental jurisdiction over the state-law claim, and thus we vacate the dismissal of the assault

---

[18] "That was my way of saying I hadn't gone to the Chief Clerk but, if I need to, I will." A. 115:22–23.

28

claim, as well. *See Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 140–41 (3d Cir. 2013).

**VI.    Conclusion**

For the foregoing reasons, the judgment of the District Court is vacated and the case is remanded for further proceedings consistent with this opinion.