**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-3235
_____

WANDREA RUSSO,
                                        Appellant

v.

THE BRYN MAWR TRUST COMPANY
_____


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:19-cv-02408)
District Judge:  Honorable Berle M. Schiller


_____

Submitted Under Third Circuit L.A.R. 34.1(a):
December 15, 2023

Before: BIBAS, PORTER and FISHER, *Circuit Judges*.

(Opinion filed: August 9, 2024)
_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

**PORTER**, *Circuit Judge*.

In April 2018, Wandrea Russo, a teller at the Bryn Mawr Trust Company bank ("BMT"), filed a discrimination complaint against BMT with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Rights Commission ("PHRC"). On May 23, 2019, Russo resigned from BMT claiming that she was constructively discharged. Russo then filed suit, alleging racial discrimination, retaliation, and a hostile work environment. The District Court granted BMT's motion for summary judgment. We will affirm.

I

Russo's supervisor at BMT's Bryn Mawr branch between 2015 and June 2018 was Therese Trainer, who is white. Russo, who is black, alleges that Trainer harassed and racially discriminated against her. Russo's allegations concerning Trainer fall into three categories: making inappropriate comments about black people to Russo, or in Russo's presence; making hostile comments or taking actions which were not expressly racial, but which Russo interpreted as racially discriminatory; and engaging in unpleasant work-related conduct. Most of the expressly racial comments or incidents occurred between 2016 and the summer of 2017, plus one racial comment in February 2018.[1]

---

[1] The dates of Trainer's allegedly hostile statements and conduct towards Russo are addressed in Russo's complaint, deposition, the parties' interrogatories, and the parties' proposed statements of undisputed facts. Concerning February 2018, Russo's complaint alleges that Trainer "suggest[ed] that she and another African-American employees [sic] were stealing pens from the Bank in February of 2018 and placing them in their purses." App. 96. The District Court understood Russo as further alleging that in February 2018, Trainer also told Russo that "she was tired of Black people complaining

Trainer's statements included comments concerning slavery, Jamaicans being able to run quickly,[2] abortion, the 2016 presidential election, Russo's clothing, and Russo's weight. Trainer also allegedly made it difficult for Russo to schedule a Paid Time Off ("PTO") day, issued work instructions to Russo that made her uncomfortable, required Russo to process her own referral paperwork (unlike other employees), asked Russo whether she had a brain, and instructed Russo not to leave the building during her lunch break. BMT investigated Russo's allegations and concluded that harassment or discrimination had not occurred, but "learned information about the day-to-day operations of the branch which [it] intend[ed] to address" by, for example, "reminding all employees about the anti-harassment policies of the Bank and providing additional training to managers and employees." App. 5.

In April 2018, Trainer assigned to another teller the origination credit for a customer's new credit card application. Russo felt the origination credit should have been attributed to her. She complained to BMT's HR department and on April 25, 2018, left work because she was not feeling well. Russo visited the emergency room at Bryn Mawr Hospital and did not return until May 1.

---

and acting like victims." *See* App. 23. Finally, Russo's complaint alleges four instances in 2018 of Trainer's work-related hostility towards Russo that were not expressly racial.

[2] According to Richard Rose, a Jamaican BMT employee, this allegation refers to Trainer urging him to work quickly and remarking that "Jamaicans are fast people" in reference to Jamaican sprinter Usain Bolt. App. 67. Bolt around this time won numerous gold medals in the 2016 Summer Olympics. Rose wrote to another BMT employee that he found Trainer's comment "harmless." *Id.*

On April 27, 2018, with Russo away from the bank, Assistant Manager Cathy Brown-Hinton, who is black, discovered a security breach: the box containing the combinations to the bank's coin vault had been taped shut rather than locked. This led BMT to open an internal investigation. In response to the investigation, another teller, Shakeena Wilson, "reported that she and Russo had gone into the vault about a month before (i.e.[,] in mid-April) and discovered that the key to the combination box was missing and the box was open, and together they taped the box shut." App. 3. The investigation also revealed that Russo previously gave a new employee the keys to another teller's cash box. Russo later agreed that taping the key box shut was an offense sufficiently serious to justify being fired from the bank.

On April 29, 2018, two days after BMT opened the security investigation, Russo filed a complaint against BMT with the EEOC and the PHRC, alleging racial discrimination. On May 1, Russo returned to work. Russo's attorney sent a letter to BMT's board detailing Trainer's alleged conduct towards Russo and demanding $500,000 in damages. On May 25, 2018, BMT HR personnel met with Russo to discuss the security investigation. Russo was suspended with pay and her office keys were confiscated.

In June 2018, Russo returned from the suspension. Her pay and responsibilities remained the same, and she had a new supervisor, Cindy Yovanov. Russo met with an HR employee, Jennifer Stryker, to discuss her transition back to work. Stryker asked whether Russo was aware that BMT had received a call from a reporter about a local newspaper's investigation of Russo's racial discrimination allegations. Russo alleges that

4

Stryker pressured Russo to tell the reporter not to publish an article about Russo's allegations and said that publication would be "bad" for Russo. App. 438. BMT denies that it discouraged Russo from cooperating with the newspaper. In any event, Russo spoke to the reporter and the article was published.

In February 2019, Russo told a co-worker that she was "planning [her] exit strategy" with her attorney so that she could "be out by April at the latest." App. 295. Around the same time, Russo complained to Yovanov that she believed that Yovanov was discriminating and retaliating against her in response to her claim with the EEOC and PHRC because Yovanov suggested that Russo apply for a promotion. Russo believed that she was "being pushed into another position and being referred to in the past tense in regards to [her] current position." App. 6. Yovanov was "confused and surprised" by this. App. 80. Russo remained in her role.

On May 22, 2019, Russo emailed Yovanov, HR Representatives, and BMT's CEO about an interaction with a hostile bank customer. Russo demanded that BMT take action. BMT responded to Russo's report within an hour and arranged a meeting between Russo and two HR representatives. The next day, BMT moved to de-market the customer, i.e., terminate the customer's relationship with the bank. Consistent with its normal policy, BMT sent the customer a form letter notifying her that "[a]s a courtesy," she was being afforded thirty days to transfer her funds before her BMT account terminated. App. 15. BMT informed Russo that if the customer returned to the bank, Russo did not need to assist her.

5

Russo then resigned from BMT, faulting BMT's failure to immediately de-market the customer. Russo alleged that BMT created "a situation where [the customer] can return to further harass [Russo] and remind [her] of what ha[d] transpired." App. 168. Russo stated that she "consider[ed] this [a] constructive discharge as a result of the Bank's repeated failure to protect [her] and recognize [her] rights." *Id.*

Russo filed suit against BMT under 42 U.S.C. § 1981, Title VII of the Civil Rights Act, the Pennsylvania Human Relations Act ("PHRA"), and Pennsylvania common law. BMT moved for summary judgment on all of Russo's claims, and the Court granted the motion. Russo appeals the District Court's decision as to her discrimination, retaliation, and hostile work environment claims.

## II

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. "We review [a] grant of summary judgment de novo and draw all reasonable inferences in favor of the nonmoving party." *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 304 (3d Cir. 2020) (internal citation and quotation marks omitted). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could rule for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). And a factual dispute is "material" if it might affect the outcome under governing law. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175 (3d Cir. 2011). A court's task is not to resolve factual

disputes but to identify them for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

III

A

Russo alleges racial discrimination under 42 U.S.C. § 1981, Title VII, and the PHRA. We analyze these claims under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 267–68 (3d Cir. 2010); *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. *Jones*, 198 F.3d at 410 (citing *McDonnell Douglas*, 411 U.S. at 802). Second, if the plaintiff succeeds, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802). This burden is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Third and finally, should the defendant carry its burden, the plaintiff must prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were a pretext for discrimination. *Jones*, 198 F.3d at 410.

Satisfying *McDonnell Douglas*'s first step—establishing a prima facie case of discrimination—requires a plaintiff to show (1) membership in a protected class, (2) that she was qualified for the position at issue, (3) that she suffered a materially adverse employment action and (4) that the circumstances of the adverse employment action support an inference of discrimination. *See Jackson v. Univ. of Pittsburgh*, 826 F.2d 230,

7

233 (3d Cir. 1987), *cert denied*, 484 U.S. 1020 (1988).

Russo alleges discrimination (a) based on her suspension with pay pending the bank's security investigation and (b) because the bank constructively discharged her by failing to de-market a hostile customer effective immediately rather than after a thirty-day transition period.

1

We assume without deciding that Russo's suspension with pay constituted a materially adverse employment action.[3] However, BMT carried its burden at *McDonnell Douglas*'s second step by articulating a legitimate, nondiscriminatory basis for its actions. *See Jones*, 198 F.3d at 410. Russo agreed that taping the key box shut was a serious security breach, sufficient to warrant termination. And at step three, Russo has not adduced any evidence that BMT's stated security rationale was pretextual.

2

Russo also alleges that BMT's failure to de-market a hostile customer effective

---

[3] In *Jones v. Southeastern Pa. Transp. Authority*, we held that a "paid suspension pending an investigation of an employee's alleged wrongdoing does not fall under any of the forms of adverse actions mentioned by Title VII's substantive provision." 796 F.3d 323, 326 (3d Cir. 2015). Thus, we held that a "suspension with pay, without more, is not an adverse employment action under the substantive provision of Title VII." *Id.* (internal quotation marks and citation omitted). But in *Muldrow v. City of St. Louis* (2024), the Supreme Court held that transfer to a different position can qualify as a materially adverse employment action so long as there is "some harm respecting an identifiable term or condition of employment." 144 S. Ct. 967, 974 (2024). Muldrow's pay and rank remained the same, but she was moved from a daylight weekday shift to rotating shifts including nights and weekends. *Id.* at 977. Thus, *Muldrow* arguably abrogated *Jones* so that a suspension with pay might, under some circumstances, constitute an adverse employment action.

8

immediately—rather than after a thirty-day period—was racially discriminatory, and constructively discharged her from BMT. A constructive discharge is an adverse employment action under *McDonnell Douglas* step one, establishing a prima facie case of discrimination. *See id.*

"Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). To establish a constructive discharge, an employee must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996) (quoting *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir. 1984)).

The constructive discharge inquiry is objective and "does not permit an employee's subjective perceptions to govern." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992) (citation omitted); *see also Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502 (3d Cir. 2010). Thus, "[a]n employee is protected from a calculated effort to pressure h[er] into resignation through the imposition of unreasonably harsh conditions . . . [but the employee] is not, however, guaranteed a working environment free of stress." *Gray*, 957 F.2d at 1083.

To determine if an employee was forced to resign, courts consider factors such as whether the employee was threatened with discharge, encouraged to resign, demoted, subjected to reduced pay, benefits or responsibilities, transferred to a less desirable position, or given unsatisfactory job evaluations. *Colwell*, 602 F.3d at 503 (citing *Clowes*

9

*v. Allegheny Valley Hosp.* 991 F.2d 1159, 1161 (3d Cir. 1993)). While "the absence of the[se] factors . . . is not necessarily dispositive," a plaintiff alleging constructive discharge must still demonstrate conduct that would "compel a reasonable person to resign." *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168–69 (3d Cir. 2001).

Russo concedes that she was not threatened with termination, encouraged to resign, demoted, subjected to reduced pay or benefits, transferred to a less desirable position, or given a poor job evaluation. BMT's prompt response to the hostile customer cannot be reasonably described as "knowingly permit[ing] conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *See Aman*, 85 F.3d at 1084; *see also Colwell*, 602 F.3d at 502–03. Although Russo was subjectively afraid of the hostile customer returning, the constructive discharge inquiry is objective. *See Gray*, 957 F.2d at 1083. BMT maintained security measures, which it communicated to Russo. And while we draw all reasonable inferences in Russo's favor, we are not bound to disregard her statement, three months before the alleged constructive discharge, that she was already "planning [her] exit strategy." App. 6.

Even if we agreed that BMT's manner of de-marketing of the hostile customer constructively discharged Russo, the claim does not survive *McDonnell Douglas* step two. BMT's response to this incident was not racially discriminatory. It acted rapidly and applied the bank's standard policy used in all de-marketing scenarios. So BMT carried the "relatively light" burden of providing a nondiscriminatory reason for its conduct. *See Fuentes*, 32 F.3d at 763.

We will affirm the District Court's decision granting BMT's motion for summary

10

judgment concerning Russo's discrimination claims.

B

Russo alleges that BMT retaliated against her for reporting Trainer and in response to her complaints filed with the EEOC and PHRC. Mirroring her discrimination claim, Russo bases this retaliation allegation on (1) BMT's security investigation and suspension (an alleged "retaliatory setup"), and (2) the customer de-marketing incident. *See* Opening Br. 21–22.

As with discrimination, Title VII and PHRA retaliation claims fall under the *McDonnell Douglas* burden-shifting framework. *See Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006). If a plaintiff establishes a prima facie case of retaliation, the employer must provide "'a legitimate, non-retaliatory reason' for its conduct." *Id.* (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)). The plaintiff may rebut this explanation by showing that the employer's reasons for its conduct are pretextual. *Id.*

At step one, to establish a prima facie case of retaliation, a plaintiff must show that: "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the [retaliatory] adverse employment action." *Moore*, 461 F.3d at 340–41 (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

"Cases in which the required causal link has been at issue have often focused on the temporal proximity between the employee's protected activity and the adverse

11

employment action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (quoting *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990)). "Where the temporal proximity is not 'unusually suggestive,' we ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)).

BMT's security investigation and paid suspension of Russo were not retaliatory because BMT initiated the investigation on April 27, 2018, two days *before* Russo's EEOC and PHRC complaints. *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015) (rejecting retaliation claim based on purported adverse employment action that preceded plaintiff's first protected activity). Although Russo raised internal complaints about Trainer earlier than April 2018, nothing in the record suggests that Brown-Hinton, who independently reported that a security box was taped shut, was aware of those complaints or had a motive to retaliate against Russo. *See id.* (concluding that a plaintiff "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted").

If we agreed that the investigation and suspension sustained a prima facie case of retaliation, Russo's argument would fail at *McDonnell Douglas* steps two and three.

12

BMT presented "legitimate, non-retaliatory" security reasons for the investigation and suspension, which Russo acknowledged. *See Moore*, 461 F.3d at 342.

Russo's other theory of retaliation—that BMT's de-marketing response to the hostile customer was "deliberately tepid" (Opening Br. 10)—is implausible. BMT responded quickly to the incident, followed its normal policy, and maintained security protections at the Bryn Mawr branch. Moreover, the timing of these events cuts against an inference of retaliation: Russo's protected activity (the EEOC and PHRC complaints) occurred in April 2018, but the hostile customer incident occurred more than a year later, in May 2019. *See Daniels*, 776 F.3d at 198 (judging a ten-month gap insufficient to establish causal connection between protected activity and alleged retaliation).

Even if BMT's hostile-client response could be construed as retaliatory, Russo's argument does not survive *McDonnell Douglas* step two because the bank applied its standard de-marketing policy—including the thirty-day account termination window— used in all such scenarios. *See Moore*, 461 F.3d at 342 (to carry its burden at *McDonnell Douglas* step two, the employer must provide "a legitimate, non-retaliatory reason for its conduct" (internal quotation marks and citation omitted)). Russo has not adduced evidence that BMT responded differently than in other de-marketing cases, or that BMT's application of its standard de-marketing policy was a pretext for retaliation.

Russo's reply brief suggests one more theory of retaliation based on Stryker's alleged June 2018 conversation with Russo about speaking to a reporter. *See* Reply Br. 5, 9. But Russo's opening brief made only a passing reference to Stryker's alleged threat, so

this argument is forfeited.[4] *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145–46 (3d Cir. 2017) ("We have long recognized, consistent with Federal Rule of Appellate Procedure 28(a) and Third Circuit Local Appellate Rule 28.1, that an appellant's opening brief must set forth and address each argument the appellant wishes to pursue in an appeal.").

Even with all factual inferences drawn in Russo's favor, neither BMT's security investigation and paid suspension of Russo, nor its handling of the hostile customer constituted Title VII and PHRA retaliation against Russo. So we will affirm the District Court's grant of summary judgment concerning Russo's retaliation claims.

C

1

Russo argues that the District Court decision "ignore[d] a virtual mountain of evidence as to hostile [working] environment, partially summed up in [Russo's] counsel's letter citing thirty disgusting incidents of discrimination." Opening Br. 25–26.

Hostile work environment claims under Title VII and the PHRA are subject to the same legal standard and are properly analyzed together. *See Atkinson v. LaFayette*

---

[4] The EEOC's amicus brief argues at length that Stryker's alleged threat against Russo constituted retaliation. However, "we generally avoid considering arguments raised solely in amicus briefs 'where[, as here,] the parties are competently represented by counsel.'" *Polansky v. Exec. Health Res. Inc.*, 17 F.4th 376, 382 n.5 (3d. Cir. 2021) (quoting *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 382 n.2 (3d Cir. 2012)); *see also DiBiase v. SmithKline Beecham Corp.*, 48 F.3d 719, 731 (3d Cir. 1995) ("[A]n amicus may not frame the issues for appeal.") (citations omitted).

*College*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

To establish a hostile work environment, a plaintiff must prove that: (1) she suffered intentional discrimination; (2) "the discrimination was severe or pervasive"; (3) "the discrimination detrimentally affected the plaintiff"; (4) "the discrimination would detrimentally affect a reasonable person in like circumstances"; and (5) "the existence of *respondeat superior* liability." *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 310 (3d Cir. 2018) (quoting *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013)).

A hostile work environment exists when a "workplace is permeated with 'discriminatory intimidation, ridicule, and insult[.]'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citations omitted). "[A] court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Mandel*, 706 F.3d at 168 (quoting *Harris*, 510 U.S. at 23).

15

Under Title VII, discrimination charges "shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). But if the charges are also filed "with a State or local agency with authority to grant or seek relief from such practice," such as the PHRA, then the limitations period expands to "within three hundred days after the alleged unlawful practice occurred." *Id.*; *see also* App. 21. The PHRA requires filing a charge of discrimination within 180 days but does not contain an analogous provision for extensions. 43 P.S. § 959(h); *see also* App. 21. Therefore, the limitations period for a plaintiff's Title VII claims can be greater than the limitations period for her PHRA claims. *See Mandel*, 706 F.3d at 164–65 (agreeing with district court's application of different statutes of limitations for Title VII and PHRA claims). In other words, when a plaintiff files a discrimination complaint with both the EEOC and the PHRC, the EEOC limitations period increases from 180 to 300 days, but the PHRC limitations period is 180 days. *See id.*

The continuing-violation doctrine provides an exception to these time limitations by allowing a plaintiff to aggregate "discriminatory acts that are not individually actionable[.]" *Id*. Such acts "can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period." *Id.* (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)). To invoke the continuing-violation doctrine, "the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Id.* at 165–66 (citing *Morgan*, 536 U.S. at 122).

Russo filed her complaints with the EEOC and PHRC on April 29, 2018. Thus, the limitations period for her complaint includes incidents that allegedly occurred on or after July 3, 2017–300 days earlier.

Most of the post-July 3, 2017 incidents alleged by Russo reflected work-related tension. This included Russo processing credit card referrals by herself (allegedly unlike white employees), Trainer ordering Russo to transport another teller and hard currency between bank branches in Russo's personal vehicle, Trainer accusing Russo of lying with respect to the procedures for processing fees, and Trainer criticizing Russo for "not being a team player." App. 96–97. Russo also alleges that in February 2018, Trainer accused black employees of stealing pens from BMT.

As noted above, to assess a hostile work environment claim, we consider "the frequency of the discriminatory conduct; its severity, whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance." *Mandel*, 706 F.3d at 168 (quoting *Harris*, 510 U.S. at 23). Russo's allegations concerning Trainer and BMT occurring after July 3, 2017 mainly evince "the sorts of frustrating tensions between an employee and her supervisor that are inherent in the workplace" (*see* App. 23), not a "workplace . . . permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Morgan*, 536 U.S. at 116 (quoting *Harris*, 510 U.S. at 21).

Russo also alleges a number of statements by Trainer about black people that occurred earlier than July 3, 2017. These included insensitive or inappropriate racial comments to Russo concerning slavery, abortion, the 2016 presidential election, personal budgeting, money and shopping, and Russo's weight.

Even if Trainer's February 2018 racial comment is construed as the basis for a continuing violation theory, supporting aggregation of the pre-July 3, 2017 otherwise time-barred conduct, Russo's claim of hostile work environment fails to survive summary judgment. Trainer's 2016–17 statements and the racial comment in February 2018 were inappropriate. Like the District Court, we "do[] not discredit Russo's feelings of offense, anger, or frustration, as the conduct in this case is entirely unprofessional. But employment law is not a civility code and Russo has failed to put forth sufficient facts to defeat the Bank's motion for summary judgment." App. 26 (citing *Faragher*, 524 U.S. at 788). "[A] lack of racial sensitivity does not, alone, amount to actionable harassment," and "'[m]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter terms and conditions of employment to violate Title VII." *Faragher*, 524 U.S. at 787. Russo remained in her job, few of the incidents or comments alleged by Russo occurred after summer 2017, and Trainer was removed as Russo's supervisor. Taken as a whole, the alleged discrimination against Russo by Trainer and BMT was not sufficiently "severe or pervasive" to sustain a prima facie case of a hostile work environment. *See Minarsky*, 895 F.3d at 310 (quoting *Mandel*, 706 F.3d at 167).

\*     \*     \*

We will affirm the District Court's grant of BMT's motion for summary judgment as to all claims.